## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| VALERIE GILLEN | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 04-CV-12517-GAO |
| | ) | |
| CNA GROUP LIFE ASSURANCE COMPANY | ) | |
| Defendant. | ) | |

## MOTION TO COMPEL PRODUCTION OF DOCUMENTS IN ACCORDANCE WITH THE SUBPOENAS TO PERMIT INSPECTION AND COPYING ISSUED TO BERNARDINO VACCARO, M.D. AND PAMELA FRIEDMAN, PSY. D.

Now comes the Defendant, CNA Group Life Assurance Company ("Defendant"), and pursuant to Rule 45 of the Federal Rules of Civil Procedure, moves this Court to: (1) compel the production of documents in accordance with the subpoenas to permit inspection and copying served on Bernardino Vaccaro, M.D. ("Dr. Vaccaro") and Pamela Friedman, Psy.D. ("Dr. Friedman"); and, (2) declare that Plaintiff has waived the asserted privilege by introducing her mental condition as part of her claim.

As explained in detail below, Defendant is entitled to gather discovery relating to Plaintiff's mental state because: (1) Plaintiff waived any privilege that she had with respect to her communications with Dr. Vaccaro and Dr. Friedman when she introduced her medical condition as part of her claim; and, (2) Defendant is entitled to discovery related to the issue of whether or not Plaintiff was and is disabled due to her alleged cognitive decline.

## FACTS

### Plaintiff Introduced Her Mental Condition As Part of Her Claim and Can Not Now Claim That Records and Communications Related to Her Mental Condition are Privileged

1.    Plaintiff claims to be disabled due to cognitive decline.  Complaint, attached hereto at Exhibit B, at ¶ 8, 12, 14.

2.    As part of Plaintiff's claim for long-term disability benefits, Plaintiff's primary care physician, Frannie Kronenberg, M.D., submitted a letter dated August 18, 2003 to Defendant.  Affidavit of Katherine R. Parsons ("Affidavit"), attached hereto at Exhibit A, at ¶ 3; see also, Exhibit C[1].  Dr. Kronenberg's letter specifically stated that:

> Valerie Gillen has been experiencing impaired cognitive abilities and impaired executive mental function that has been progressive over the past two years.
>
>         * * *
>
> Ms. Gillen will follow up with Dr. Acar and also with Dr. Bernardino Vaccaro, Psychiatrist, of Brigham and Women's Hospital, 75 Francis Street, Boston, MA 02115.

Exhibit C.

3.    Plaintiff or Plaintiff's physician's on behalf of Plaintiff, submitted a letter to Defendant from Dr. Pamela Friedman to Dr. Diler Acar dated March 3, 2003.  Affidavit at ¶ 5; see also Exhibit D.  This letter is a summary of a neuropsychology evaluation performed by Dr. Friedman with respect to Plaintiff's alleged cognitive decline.  See Exhibit D.

### Dr. Vaccaro's, Dr. Friedman's and Plaintiff's Refusal to Produce or Allow Production of Documents in Accordance with the Subpoenas

4.    Defendant had Dr. Friedman served with a Subpoena to Permit Inspection and Copying on June 24, 2005.  Affidavit at ¶ 6; see also Exhibit E.

---

[1] All personal data identifiers have been redacted from all Exhibits filed herewith in accordance with Local Rule 5.3 of the Local Rules of the United States District Court for the District of Massachusetts.

5.  Defendant had Dr. Vaccaro served with a Subpoena to Permit Inspection and Copying on June 28, 2005.  Affidavit at ¶ 7; see also Exhibit F.

6.  By letter dated June 28, 2005, Dr. Friedman objected to the production of the subpoenaed documents, claiming that they are privileged.  Affidavit at ¶ 8; see also Exhibit G.

7.  On July 11, 2005, Dr. Vaccaro's office called Defendant's counsel and indicated that Plaintiff objected to the production of documents, that Plaintiff's attorney had instructed Dr. Vaccaro's office not to produce the documents, and that the documents would not be produced.  Affidavit at ¶ 9.

8.  By email dated July 11, 2005, Plaintiff's counsel confirmed Plaintiff's objection to the production of documents by Dr. Vaccaro.  Affidavit at ¶ 10; see also Exhibit H.

9.  On July 13, 2005, Defendant's counsel faxed Plaintiff's counsel a letter explaining the basis of Defendant's entitlement to the documents subpoenaed from Dr. Vaccaro and Dr. Friedman.  Affidavit at ¶ 11; see also Exhibit I.

10.  On July 14, 2005, Defendant's counsel called Plaintiff's counsel to follow up on the July 13, 2005 fax.  Affidavit at ¶ 12.  Defendant's counsel again explained Defendant's position and Plaintiff's counsel indicated that he would "think about it."  Id.

11.  On July 22, 2005, Defendant's counsel sent a follow up email to Plaintiff's counsel regarding whether or not Plaintiff would permit inspection and copying of the subpoenaed documents of Dr. Vaccaro and Dr. Friedman.  Affidavit at ¶ 13; see also Exhibit J. Plaintiff's counsel indicated that he would "let [Defendant's counsel] know."  Id.

12.  To date, Plaintiff's counsel has not responded to Defendant's counsel request for the records of Dr. Vaccaro and Dr. Friedman.  Affidavit at ¶ 14.

13.   To date, Defendant has not received any records from Dr. Vaccaro or Dr. Friedman.

Affidavit at ¶ 15.

## STANDARD

As this Court is well aware, Rule 26 permits the Court to "order discovery of any matter relevant to the subject matter involved in the action." F.R.C.P. 26(b)(1). Rule 26 defines relevant information as "information that need not be admissible at trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Id. As explained in detail below, not only is the discovery sought in this case reasonably calculated to lead to the discovery of admissible evidence, it is directly relevant to Plaintiff's claims.

## ARGUMENT

Massachusetts law recognizes a patient-psychotherapist privilege, but it is not absolute. See M.G.L. c. 233 § 20B. Specifically, the privilege "shall not apply . . . in an proceeding . . . in which the patient introduces his mental or emotional condition as an element of his claim or defense, and the judge or presiding officer finds that it is more important to the interests of justice that the communication be disclosed than that the relationship between patient and psychotherapist be protected." M.G.L. c. 233 § 20B(c). Defendant is entitled to the discovery it seeks from Dr. Vaccaro and Dr. Friedman regarding Plaintiff's mental condition because: (A) Plaintiff waived any privilege that she had with respect to her communications with Dr. Vaccaro and Dr. Friedman when she introduced her mental condition as part of her claim; and (B) Defendants are entitled to discovery related to the primary issue in this case, whether or not Plaintiff was and is disabled due to her alleged cognitive decline.

**A.    Plaintiff Waived Any Privilege She Had With Respect to Her Communications With Dr. Vaccaro and Dr. Friedman When She Introduced Her Mental Condition as Part of Her Claim**

In her Complaint, Plaintiff specifically claims to be disabled due to cognitive decline. Facts at ¶ 1.[2] As such, Plaintiff has made her mental condition a significant part of her claim. Furthermore, Dr. Vaccaro and Dr. Friedman were specifically identified as treating Plaintiff for her alleged cognitive decline. A letter from Plaintiff's primary care physician to Defendant specifically stated that Plaintiff was following up with Dr. Vaccaro for her impaired cognitive abilities and impaired executive mental function. Facts at ¶ 2. Similarly, a letter from Dr. Friedman to Dr. Acar reveals that Dr. Friedman evaluated Plaintiff's alleged cognitive decline in March of 2003. Facts at ¶ 3. Consequently, the documents subpoenaed from Dr. Vaccaro and Dr. Friedman are directly relevant to Plaintiff's claim that she is disabled due to her alleged cognitive decline and by placing her mental condition in issue, Plaintiff has waived any privilege she had with respect to any communications she had with Dr. Vaccaro and/or Dr. Friedman. See M.G.L. c. 233 § 20B(c).

**B.    Defendants are Entitled to Discovery Relating to the Primary Issue in this Case, Whether or Not Plaintiff was and is Disabled Due to Her Alleged Cognitive Decline**

As explained above, Plaintiff claims to be disabled due to cognitive decline and treated with Dr. Vaccaro and Dr. Friedman for her alleged cognitive impairments. The documents subpoenaed from Dr. Vaccaro and Dr. Friedman are directly relevant to Plaintiff's claim that she is disabled due to her alleged cognitive decline. Defendant is entitled to obtain discovery with respect to the primary issue in this case, whether or not Plaintiff was and is actually disabled due to her alleged cognitive decline.

---

[2] The Facts cited here refer to the facts set forth at PP. 2-3.

## CONCLUSION

As explained above, Plaintiff waived any privilege she may have had with respect to her communications with Dr. Vaccaro and Dr. Friedman when she introduced her mental condition as part of her claim.  Consequently, the Defendant respectfully requests that this Court: (1) order Dr. Vaccaro and Dr. Friedman to comply with the subpoenas served in this case; (2) declare that the Plaintiff has waived any privilege she may have had with respect to her communications with Dr. Vaccaro and Dr. Friedman; and (3) due to Defendant's clear entitlement to the documents sought from Dr. Vaccaro and Dr. Friedman and Plaintiff's unwillingness to cooperate with Defendant's numerous attempts to obtain these records without Court intervention, order Plaintiff to pay for Defendant's costs incurred in bringing this Motion to Compel ($756.00 + cost of preparing for and attending any scheduled hearing).  Affidavit at ¶ 16.

Respectfully Submitted,

DEFENDANT CNA GROUP LIFE
ASSURANCE COMPANY

By its Attorneys,

David B. Crevier, BBO #557242
Katherine R. Parsons, BBO # 657280
1500 Main Street, Suite 2020
Springfield, MA 01115-5532
(413) 787-2400
(413) 781-8235 (fax)
Email: dcrevier@crevierandryan.com
        kparsons@crevierandryan.com

## LOCAL RULE 7.1 CERTIFICATION

I certify that the attorneys in this case have conferred and attempted in good faith to resolve or narrow the issues contained in this motion.

## CERTIFICATE OF SERVICE

I certify that I served a true copy of the foregoing on all counsel of record said service having taken place this 19th day of August 2005.

Exhibit A

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| VALERIE GILLEN | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 04-CV-12517-GAO |
| | ) | |
| CNA GROUP LIFE ASSURANCE COMPANY | ) | |
| Defendant. | ) | |

**AFFIDAVIT OF KATHERINE R. PARSONS IN SUPPORT OF DEFENDANT'S
MOTION TO COMPEL PRODUCTION OF DOCUMENTS IN ACCORDANCE
WITH THE SUBPOENAS TO PERMIT INSPECTION AND COPYING ISSUED
TO BERNARDINO VACCARO, M.D. AND PAMELA FRIEDMAN, PSY. D.**

NOW COMES Katherine R. Parsons, and under oath does hereby state and depose:

1. My name is Katherine R. Parsons and I am the attorney for the Defendant in the above captioned case.

2. All averments made herein are based on my personal knowledge.

3. <u>Exhibit B</u>[1], attached hereto, is a true and accurate copy of the Complaint in this case.

4. <u>Exhibit C</u>, attached hereto, is a true and accurate copy of a letter dated August 18, 2003 from Frannie Kronenberg, M.D. to Defendant, submitted as part of Plaintiff's claim for long term disability benefits and provided to our office as part of Plaintiff's claim file.

5. <u>Exhibit D</u>, attached hereto, is a true and accurate copy of a letter dated March 3, 2003 from Pamela Friedman, Psy. D. to Diler Acar, M.D. that was provided to our office as part of Plaintiff's claim file.

---

[1] All personal data identifiers have been redacted from all Exhibits filed herewith in accordance with Local Rule 5.3 of the Local Rules of the United States District Court for the District of Massachusetts.

6. <u>Exhibit E</u>, attached hereto, is a true and accurate copy of the subpoena served upon Pamela Friedman, Psy. D. on June 24, 2005.

7. <u>Exhibit F</u>, attached hereto is a true and accurate copy of the subpoena served upon Bernardino Vaccaro, M.D. on June 28, 2005.

8. By letter dated June 28, 2005, Pamela Friedman, Psy. D. objected to the production of Plaintiff's medical records, claiming that they are privileged. <u>Exhibit G</u>, attached hereto is a true and accurate copy of the June 28, 2005 letter from Pamela Friedman, Psy. D. to Defendant's counsel.

9. On July 11, 2005, Bernardino Vaccaro, M.D.'s office called our office and indicated that Plaintiff objected to the production of documents, that Plaintiff's attorney had instructed Dr. Vaccaro's office not to produce the documents, and that the documents would not be produced.

10. By email dated July 11, 2005, Plaintiff's counsel confirmed Plaintiff's objection to the production of documents by Bernardino Vaccaro, M.D. <u>Exhibit H</u>, attached hereto, is a true and accurate copy of the email from Plaintiff's counsel, Robert Elmer, Esq., to Defendant's counsel.

11. By letter dated July 13, 2005, Defendant's counsel faxed Plaintiff's counsel a letter explaining the basis of Defendant's entitlement to the records of Bernardino Vaccaro, M.D. and Pamela Friedman, Psy. D. <u>Exhibit I</u>, attached hereto, is a true and accurate copy of the letter dated July 13, 2005 that was faxed to Plaintiff's counsel from Defendant's counsel.

12.  On July 14, 2005, Defendant's counsel called Plaintiff's counsel to follow up on the

July 13, 2005 fax.  Defendant's counsel again explained Defendant's position and

Plaintiff's counsel indicated he would "think about it."

13.  On July 22, 2005, Defendant's counsel sent a follow up email to Plaintiff's counsel

regarding whether or not Plaintiff would allow Defendant's access to the medical

records of Bernardino Vaccaro, M.D. and Pamela Friedman, Psy. D.  Plaintiff's counsel

indicated that he would "let [Defendant's counsel] know."  Exhibit J, attached hereto, is

a true and accurate copy of the emails exchanged between Defendant's counsel and

Plaintiff's counsel on July 22, 2005.

14.  To date, Plaintiff's counsel has not responded to Defendant's counsel request for the

records of Bernardino Vaccaro, M.D. and Pamela Friedman, Psy. D.

15.  To date, Defendant has not received any records from Bernardino Vaccaro, M.D. or

Pamela Friedman, Psy. D.

16.  It took Defendant's counsel 4.2 hours to prepare this Motion at $180.00/hour, for a total

of $756.00.


Signed under the pains and penalties of perjury this 18th day of August, 2005.


Katherine R. Parsons

Exhibit B

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

2004 NOV 30 P 2: 08

U.S. DISTRICT COURT
DISTRICT OF MASS.

VALERIE GILLEN, )
)
Plaintiff, )          CIVIL ACTION NO.
)
v. )
)
CNA GROUP LIFE ASSURANCE )
COMPANY, )          **04 - 12517 GAO**
)
Defendant. )

## COMPLAINT FOR BENEFITS DUE

### Nature of the Action and Claim for Relief

1.    The plaintiff brings this action pursuant to the Employee Retirement Income

Security Act of 1974 ("ERISA"), and in particular 29 U.S.C. § 1132(a)(1)(B), for the purpose

of recovering Long Term Disability benefits due under the terms of a Group Long Term

Disability Plan, obtaining a declaration of the rights and other legal obligations of the parties

with respect to the Group Long Term Disability Plan, and clarifying the plaintiff's rights to

future benefits under the Plan. A real, substantial, justiciable and actual controversy exists

between the parties over whether the defendant, CNA Group Life Assurance Company, has

properly denied Long Term Disability benefits, properly administered the handling of the

plaintiff's claim for Long Term Disability benefits, and otherwise breached its obligations

under the Plan, ERISA and the Code of Federal Regulations.

<u>Parties</u>

2.      The plaintiff, Valerie Gillen, is a Massachusetts resident residing at 38 Choate

Road, Belmont, Middlesex County, Massachusetts.

3.      The defendant, CNA Group Life Assurance Company ("CNA"), has a place

of business in Maitland, Florida. At all times relevant to the allegations herein, CNA has

been licensed to do business in the Commonwealth of Massachusetts by the Massachusetts

Department of Insurance, and has been in the business of selling insurance, and has sold

insurance, in the Commonwealth of Massachusetts.

<u>Jurisdiction and Venue</u>

4.      Pursuant to ERISA, 29 U.S.C. sec. 1001, et seq., this Court has original

jurisdiction over this dispute.

5.      Pursuant to 29 CFR § 2560.503.1(l), the plaintiff is deemed to have exhausted

the administrative remedies available because the defendant has failed to follow a claims

procedure consistent with 29 CFR § 2560.503.1 of the Federal Regulations governing claims

for Long Term Disability benefits by failing to timely make a determination of coverage and

failing to timely respond to the plaintiff's appeal.

6.      Venue is proper because the plaintiff resides in Massachusetts; the defendant

is subject to personal jurisdiction in the District of Massachusetts; the Long Term Disability

Plan at issue affords coverage to the plaintiff in Massachusetts; and the plaintiff has suffered

damages within Massachusetts and is at risk of suffering further damages in Massachusetts.

<u>Facts</u>

7.    CNA issued Group Long Term Disability Insurance Policy No. SR-83125898 (the "CNA Policy"), effective as of August 1, 2001, to Hunt Ansbacher Offices. Upon information and belief, a true and accurate copy of the CNA Policy is attached hereto as Exhibit A.

8.    The CNA Policy covers the plaintiff, Valerie Gillen, who was a full time employee of Hunt Alternatives, one of the Hunt Ansbacher Offices in Massachusetts, during the effective period of the CNA Policy and on May 21, 2003, when Ms. Gillen began her disability leave.

9.    Under the terms of the CNA Policy, the Long Term Disability policy does not cover any "loss caused by, contributed to, or resulting from a Pre-existing condition."

10.    A "Pre-existing condition" is defined by the CNA Policy as "a condition for which medical treatment or advice was rendered, prescribed or recommended within 3 months prior to" the employee's effective date of insurance.

11.    Ms. Gillen began her employment at Hunt Alternatives on September 9, 2002, and, thus, this is her effective date of insurance.

12.    Some period of time after Ms. Gillen began her employment, she began to experience a decline in her cognitive functioning.

13.    Ms. Gillen's treating physicians were unable to identify any reason for the decline in Ms. Gillen's cognitive functioning.

14. The decline reached a point where Ms. Gillen could no longer perform the material and substantial duties of her position as Senior Advisor/ Director of External Relations for Hunt Alternatives.

15. In an effort to address the cognitive decline, Ms. Gillen sought treatment for a meningioma that had been diagnosed years before, but was not thought to impact her cognitive ability.

16. Ms. Gillen's neurosurgeon agreed to remove the meningioma, but at no time did he opine that the meningioma was causing or contributing to the decline in her cognitive functioning.

17. The removal of Ms. Gillen's meningioma in May of 2003 did not solve Ms. Gillen's cognitive difficulties, and she is still unable to perform the material and substantial duties of her position at Hunt Alternatives. In fact, Ms. Gillen's cognitive functioning has continued to decline.

18. Ms. Gillen's treating physicians now believe that she may be suffering from early onset Alzheimer's disease.

19. On August 6, 2003, Ms. Gillen filed a claim for Long Term Disability benefits.

20. CNA wrote to Ms. Gillen on February 7, 2004, which was over six months after she filed her claim, and denied the claim based upon the pre-existing condition exclusion.

21. CNA failed to comply with 29 CFR § 2560.503-1(f)(3) of the Rules and Regulations for Administration and Enforcement under ERISA in not timely providing a notification of benefit determination.

-4-

22.    According to CNA, Ms. Gillen received treatment for a severe headache from August 4, 2002 to August 8, 2002, which was during the three months prior to September 9, 2002, Ms. Gillen's effective date of insurance.

23.    CNA noted in its denial letter that while Ms. Gillen was treated for this August, 2002, headache, her physicians observed the menigioma.

24.    However, Ms. Gillen's treatment for a severe headache from August 4, 2002 to August 8, 2002 had nothing whatsoever to do with her menigioma or her subsequent disability.

25.    This headache was diagnosed as either "a narcotic withdrawal headache or more probably a postlumbar puncture headache."

26.    Further, the meningioma noted during the August 2002 evaluation of Ms. Gillen was not noted to be a cause of Ms. Gillen's symptomatology. Rather, the meningioma was simply noted to be present, as it had been for years. In fact, the August 4, 2002 Radiology Report notes the presence of the meningioma on the CT and also concludes as follows: "No CT evidence to explain patient's symptomatology."

27.    Thus, the meningioma is not "a condition for which medical treatment or advice was rendered, prescribed or recommended within 3 months prior to" September 9, 2002, which is Ms. Gillen's effective date of insurance.

28.    Moreover, despite the apparent assumption by CNA, the meningioma was not a cause of Ms. Gillen's cognitive decline.

29.     By letter dated April 27, 2004, Ms. Gillen's neurosurgeon, Dr. Peter Black, confirmed again that Ms. Gillen's meningioma did not cause or contribute to Ms. Gillen's cognitive decline.

30.     By letter dated June 1, 2004, Ms. Gillen appealed CNA's denial.

31.     By letter dated June 21, 2004, CNA acknowledged receipt of the appeal letter, but stated that the file would be reviewed and would only be referred for a formal appeal review after being reviewed.

32.     By letter dated July 2, 2004, CNA notified the plaintiff that it was maintaining its position and would forward the file to the "appeals area."

33.     By letter dated July 29, 2004, CNA notified the plaintiff that it required an extension of 45 days, but neglected to provide the basis for needing additional time in violation of the Code of Federal Regulations.

34.     As of November 23, 2004, almost four months since CNA notified the plaintiff of its need for an additional 45 days, the plaintiff has not received a decision from CNA regarding her appeal. Accordingly, CNA has breached its obligations under the Plan, and, by refusing to address the plaintiff's appeal, has blocked her ability to pursue any further administrative remedies.

### Count I: Benefits Due

35.     Ms. Gillen repeats her allegations contained in paragraphs 1 through 34 as though set forth fully herein.

36.     Ms. Gillen seeks a judicial determination by this Court pursuant to 29 U.S.C. §

1132(a)(1)(B) that CNA is obligated under the CNA Policy to pay Ms. Gillen's Long Term

Disability benefits.

37.     A judicial determination of the rights and obligations of the parties under the

CNA Policy is necessary and appropriate.

WHEREFORE, the plaintiff, Valerie Gillen, prays that this Court:

1.     Declare that CNA is obligated under the CNA Policy to pay to Ms. Gillen

Long Term Disability benefits;

2.     Award prejudgment interest on any amount determined to be due Ms. Gillen;

3.     Order such other and further relief as this Court deems just and proper; and .

4.     Award the plaintiff attorneys' fees and her costs.

## THE PLAINTIFF DEMANDS A TRIAL BY JURY.

The Plaintiff,
VALERIE GILLEN,
By her attorneys,

_11-30-04_
Date:

Allan E. Taylor
BBO #493180
Robert M. Elmer
BBO #640269
TAYLOR, DUANE, BARTON
& GILMAN, LLP
160 Federal Street
Boston, MA 02110
(617) 654-8200

Exhibit C

**B W H**

Frannie R. Kronenberg, MD
Medical Director
Brigham and Women's Physician Group
850 Boylston Street, Suite 530
Chestnut Hill, MA 02457

To:    CNA Insurance Companies
From:  Frannie R. Kronenberg, MD
Re:    Valerie Gillen, LTD Physician's Statement
Date:  August 18, 2003

1.HISTORY
Valerie Gillen has been experiencing impaired cognitive abilities and impaired executive mental function that has been progressive over the past two years. She had a left parietal brain tumor (meningioma) surgically excised in 5/27/03, by Dr. Peter Black, neurosurgeon at Brigham and Women's Hospital, 75 Francis St., Boston, MA 02115. It was thought that this might have been responsible for some of her impairments. Despite nearly three months of medical leave, she has not had any improvements since this surgery. She has also had difficulties with vision, headaches and pre-diabetes, which are all relatively new conditions complicating her current health.

2.MEDICAL CONDITION
As above, impairment of cognitive abilities and executive mental functioning of unclear etiology. These have been documented on Neuropsychiatric Testing through Dr. Diler Acar, Neurologist, Brigham and Women's Hospital, 75 Francis St., Boston, MA 02115. Further documentation can be requested from her. Symptoms at this time include difficulty concentrating, lack of organization skills, poor memory, limited attention, difficulty with word finding, inversion of words and numbers, fatigue, disturbances in sleep, depression. She has diplopia which is unexplained. She has Necrobiosis Dermatitis, which is a precursor of diabetes.

3.NATURE OF TREATMENT
Ms. Gillen will follow up with Dr. Acar and also with Dr. Bernardino Vaccaro, Psychiatrist, of Brigham and Women's Hospital, 75 Francis St., Boston, MA 02115. Further evaluation is required to ascertain the cause of her impairments and to determine treatment.

4.PHYSICAL LIMITATIONS
None.

5.MENTAL HEALTH
As noted above, depression is only a part of her condition. The predominant problem is of mental functioning in terms of cognitive deficits and impaired executive functioning.

6.PROGNOSIS
The potential for recovery is unknown at this time. Further investigation as to the cause will be pursued with Drs. Vaccaro and Acar. Further management and treatment will be under their direction and coordination. It is unclear at this time as to whether or not her current problems are related to the effects of the brain tumor or worsened by the surgical excision of the brain tumor or due to another cause.

1

**REMARKS:**

Ms. Gillen is a 49 year old woman with a history of breast cancer, a brain tumor, headaches, pre-diabetes and progressive decline in cognitive as well as executive functions. Based on this decline and her current disabling level of functioning, she is not currently capable of returning to work. She has been advised to pursue long term disability so that she can pursue appropriate evaluation and treatment. Further testing and consultation will be required before a more precise diagnosis and prognosis can be provided.

FRANNIE R. KRONENBERG, M.D.
Brigham and Women's Physician Group
850 Boylston Street, Suite 530
Chestnut Hill, MA 02467

2

Exhibit D



**PSYCHOLOGICAL**
SERVICES, INC.

March 3, 2003

Diler Acar, M.D.
Newton-Wellesley Neurology, Inc.
2000 Washington Street, Suite 567
Newton Lower Falls, MA 02462

## INITIAL NEUROPSYCHOLOGY EVALUATION

Re:    Valerie Gillen
D.O.B.: ▓▓▓▓▓▓
Date of Examination: 3/3/03

Dear Diler,

Thank you for referring Ms. Valerie Gillen for a neuropsychological evaluation. As you know, Ms. Gillen is a 49-year-old right-handed woman with a left parietal meningioma who has undergone numerous surgeries in the past few years and now reports cognitive difficulties. She was referred for the current neuropsychological evaluation in order to explore the nature and extent of her impairments and to help clarify diagnosis. I reviewed the notes you forwarded and met with Ms. Gillen who provided a current history.

**History of Current Symptoms:** Ms. Gillen reported that her memory problems began immediately after her hysterectomy in 1/02. At that time, her difficulties consisted of misplacing her keys and/or forgetting conversations, but she stated that these were mild and "livable." However, six months later, following another surgery, her cognitive functioning declined dramatically. While she stated that she used to have a photographic memory, she now must write everything down. She reported difficulty recalling conversations, the names of people she works with, and sequences of numbers. She has overpaid bills because of careless errors and burned meals because she forgot the stove was on. Ms Gillen also reported a decline in her ability to think in a clear and organized manner, and stated that she is not as "sharp" as she once was. She has noticed difficulties in her ability to write effectively, which she believes is due to her inability to organize and structure the material. She no longer reads for pleasure because she found she had to continuously re-read the material to understand what she was reading. Finally, Ms. Gillen was concerned about her recent tendency to "complete tasks in reverse," such as putting on her shirt backward, transposing words in a sentence, driving the wrong way down a one-way street, and returning items of clothing to wrong place (i.e., putting her dress in a drawer and undergarments in her closet). As above, Ms. Gillen reported that her cognitive problems began after her hysterectomy, but were not significantly distressing until six months later, following her lumpectomy. She is unsure whether her cognitive functioning is continuing to decline at this point, or whether she is simply more aware of her difficulties.

**PMH:** Ms. Gillen's birth and development were reportedly normal. She reported that she was born with a congenital lung abnormality, but that it has not manifested as of yet. Childhood medical history is notable for three significant injuries, including lacerating her lower back after a fall at age 6, being hit on the head

Sep-29-03 02:51pm   From-EXTERNAL AFFAIRS                        617-496-4511        T-046  P.09/12  F-387

Patient Name: Valerie Gillen                                                        Page 2

with a shovel at age 11, and being shot with a cardboard bullet from a rifle at age 12. Apparently, a neighbor's child was playing with a gun, and although it was not a real bullet, Ms. Gillen suffered from excessive gunpowder in her eyes and as a result, has significantly reduced vision in her right eye. She continues to experience lower back pain as a result of the first incident, but did not report any lasting medical or neurological consequences from being struck on the head with a shovel. Adult medical history is remarkable for an appendectomy (1987), two lumpectomies, a mastectomy and reconstructive surgery, a partial hysterectomy because of fibroids and endometriosis followed later by a complete hysterectomy (2002) because of complex cysts on her ovaries, surgery for a basal cell carcinoma (2000), and a septoplasty because of difficulty breathing. She reported that she became severely anemic following one of her surgeries, resulting in restless leg syndrome. She was diagnosed with rheumatoid arthritis in her 20's, although she is unsure whether this was an accurate diagnosis. She was treated with a significant amount of anti-inflammatory medications, which resulted in chronic gastrointestinal difficulties. She has a history of migraines, but has not experienced one in the past several years. She was diagnosed with a left parietal meningioma approximately one year ago, and is being followed by Dr. Peter Black at BWH. She has hypertension and elevated cholesterol, and reported that one of her MRI's revealed multiple strokes. She reported one head injury as an adult, when she was struck on the head with a metal briefcase on an airplane, and lost consciousness briefly. She was not aware of any neurological consequences of this event. She recently underwent a sleep study at BWH to assess for sleep apnea. She reported vision problems which have been evaluated by several physicians, and was recently told that the problem may be the result of the meningioma. Finally, she reported mild hearing impairment and stated that a routine hearing exam revealed a mass on her ear drum which may need to be removed.

Psychiatric history is notable for a few courses of outpatient therapy. She is currently in treatment with a psychologist whom she has been seeing weekly for the past 9 months. Alcohol usage consists of 1-2 drinks per day. She was a former smoker, but quit approximately 20 years ago. Current medications include Prilosec, Effexor, Fosimax, Trazadone, a diuretic for hypertension, and stimulant to help her "focus better." She also has a prescription for Vioxx and Mirapex to use as needed.

**Family Medical History:** Ms. Gillen's mother is 72 years old and suffers from Alzheimer's Disease (diagnosed approximately 10 years ago). She also has a history of hypertension and multiple benign breast cysts. Her father is 70 and suffers from esophageal cancer, melanoma, diabetes, and acid reflux. She has two older sisters and two younger brothers, most of whom suffer from migraines and acid reflux. One sister also has hypertension. A maternal uncle was diagnosed with Alzheimer's at approximately age 70.

**Review of Systems:** Ms. Gillen described her current mood as "frustrated and anxious about health issues." She denied significant depression. She reported that although she has enough energy to get through the day, she has significantly less energy since the multiple surgeries. She reported occasional difficulty establishing sleep, but is able to sleep approximately 7 hours once she does fall asleep, which is a marked improvement from the past few years. She denied significant changes in her appetite, although she has lost weight recently because of the diuretic she is taking for hypertension.

**Educational and Occupational History:** Mr. Gillen described herself as an "excellent" student throughout school. She was never held back a grade, diagnosed with learning disabilities, or placed in remedial classes of any kind. In fact, she reported earning straight A's in all subjects, and stated that her reading level was significantly more advanced than her peers at an early age. She completed an MBA program at an American university in Vienna while working for the United Nations. Occupational history includes 14 years working as a Public Affairs Officer for the U.S. Government in Washington D.C., 9 years working for the U.N. in

Patient Name: Valerie Gillen                                                    Page 3

Vienna, and 3 years working for the US Ambassador in Vienna.  When the Ambassador's term ended, Ms.
Gillen accompanied her back to the US, where together, they developed the Women in Public Policy
Program at Harvard University.  Ms. Gillen currently serves as her senior advisor, and reported that she is
extremely happy with her position

**Psychosocial History**: Ms. Gillen has been married and divorced twice.  She has been involved with her
current partner for 19 years.  She does not have any children.

## EXAMINATION

**Behavioral Observations**: Ms. Gillen was well-groomed and appropriately dressed.  She was pleasant,
engaging and willing to attempt all tests.  She maintained good eye contact and her speech was of
appropriate rate, tone, and volume.  There were no significant word-finding pauses or name-finding
difficulties revealed through conversational speech.  She comprehended test instructions easily and did not
appear to become overly frustrated with her performance on any of the measures.  She appeared to possess
adequate insight into her cognitive problems.  Although she was able to provide an adequate recount of her
history, Ms. Gillen demonstrated difficulty recalling the exact chronology of her medical treatment and
procedures.  The tests were administered in the standardized manner and can be considered a reasonable
estimate of Ms. Gillen's current cognitive abilities.

**Evaluation Procedures**: **Clinical Interview, General Intellectual Assessment**: National Adult Reading
Test-American, **Attention/Executive Functioning Battery**: Digit Span, Letter-Number Sequencing, Mental
Controls subtests of the WMS-III, F-A-S, Category Generation; Trail Making Test, Stroop Interference Test,
Paced Serial Addition Test; **Reasoning/Abstractions**:  Similarities and Matrix Reasoning Subtests of the
WAIS-III, Wisconsin Card Sorting Test; **Memory Battery**: Buschke Selective Reminding, Logical Memory
subtest of the WMS-III, Free and Cued Recall Test; **Language Battery**: Boston Naming Test, BDAE screen;
**Visuospatial /Perceptual Battery**: Benton Facial Recognition;  **Affective Battery**: Beck Depression
Inventory, Beck Anxiety Inventory.

**Overall Intellectual Ability**:  Ms. Gillen overall intellectual functioning was estimated to fall in the superior
range, based on performance on the American Adult Reading Test (ANART estimated VIQ=123).  Given
her academic and occupational history, this does not likely reflect a decline from previous functioning, and is
therefore an appropriate estimate of her premorbid abilities.

**Attention and Executive Function**:  Performance on measures in this area was variable.  For instance, she
performed well on the Spatial Span subtest of the WMS-III, as she was able to recall a series of 7 blocks
forward and 5 in reverse (scaled score=14; 90th percentile).  She performed normally on the Mental Controls
subtest of the WMS-III, earning a scaled score of 12 (75%th percentile).  She was able to recite the months
of the year forward in 3 seconds without errors, and only required 8 seconds to complete the task in reverse.
She also performed well on the Trailmaking Test.  She completed Trails A in 20 seconds without errors (90th
percentile), and Trails B in 53 seconds without errors (75th percentile).  Lurla's Graphomotor Sequences
were completed without impairment.  On the Wisconsin Card Sorting Test, she was able to complete 5
categories and only made 6 perseverative errors.  Relative to these strong performances on several tests of
attention and executive function, Ms. Gillen demonstrated slightly greater difficulty on several other tasks in
this area.  For instance, she required numerous repetitions on the Arithmetic Subtest of the WAIS-III, a task
which is highly dependent on auditory attention (scaled score=9; 37th percentile).  While she performed well
on Digits Forward, she demonstrated greater difficulty performing the task in reverse (scaled score=9; 37th

Patient Name: Valerie Gillen                                                                    Page 4

percentile).  Performance on the Letter-Number Sequencing subtest of the WAIS-III fell in the average range, as she was able to recall a sequence of 6 numbers and letters.  She also performed in the average range on the Similarities subtest of the WAIS-III, which is slightly lower than would be expected, given her high estimated verbal IQ.  Verbal fluency for letters of the alphabet was normal, but she demonstrated slightly greater difficulty generating words to semantic categories.  For example, she was able to generate 45 words across three letters of the alphabet (F-A-S), but only 36 words across three semantic categories.  On the Paced Auditory Serial Addition Test (PASAT), she performed at approximately the 16th percentile.  Finally, the test in this area on which she demonstrated the greatest difficulty was the Stroop Interference Test.  She made numerous errors on this test and her performance placed her at approximately the 3rd percentile for age.  Taken together, performances on tests of attention and executive function reveal variable impairment.  While her performances on many of the measures in this area still fall within the average range, it is important to note that they represent a relative weakness, given her high level of premorbid ability.

**Memory:**  Performances on tests in this area were notable for mild impairment at the stages of acquisition and retrieval, but were normal with regard to retention.  For instance, she only learned a total of 44 words across all 6 trials of the Buschke Selective Reminding Test, which is slightly lower than would be expected for age.  She was only able to recall 7 of the 12 words during the delayed recall condition (and correctly recalled 11 of the 12 words when presented with multiple-choice), and 9 of the 12 words after a 30-minute period of filled delay (and correctly identified all 12 words with multiple-choice).  She performed similarly on the Free and Cued Selective Reminding Test, as she was only able to correctly recall 29 of the 48 words during the free recall condition, but recalled all 48 words when provided with a semantic cue during the cued condition.  Finally, Ms. Gillen was administered the Logical Memory Subtest of the WMS-III in order to assess whether her acquisition and retrieval would be enhanced if information were provided within the context of a story.  She earned a scaled score of 11 on Logical Memory I (63rd percentile), and a scaled score of 13 on Logical Memory II (84th percentile).  This pattern of performance is similar to that observed on other memory tests, as her retention over time is relatively stronger than her immediate retrieval of the information.  Taken together, performances on tests of memory illustrate Ms. Gillen's mild impairment at the stages of acquisition and retrieval, and her intact performance at the stage of memory retention.

Ms. Gillen performed normally on the Rey-Osterreith Complex Figure, which is a measure of nonverbal memory.  She correctly reproduced 26.5 visual details during the incidental recall condition (88th percentile), and 26 visual details during the delayed recall condition (88th percentile).   Performance on this measure is not suggestive of impairment with nonverbal memory.

**Language:**  Performance on a task of confrontation naming was normal.  On the Boston Naming Test, she spontaneously named 55 items, generated the name of an addition item with semantic cueing, and generated the names of two additional items with phonemic cueing.  She correctly responded to complex ideational questions on the Boston Diagnostic Aphasia Examination screen, and was able to repeat single words and phrases without impairment.  Affective prosody was normal.  As above, fluency to letters of the alphabet was normal, but she demonstrated relatively greater difficulty completing this task to semantic category.

**Visuospatial Ability:**  Performance on tasks in this area was normal.  She earned a corrected score of 45 on the Benton Facial Recognition Test, placing her in the normal range.  She performed well on the Matrix Reasoning subtest of the WAIS-III, illustrating her intact ability to analyze complex visual patterns (scaled score=12; 75th percentile).  Her copy of the Rey-Osterreith Complex Figure was extremely accurate, and she approached the design in an organized and well-planned manner.

Sep-29-03  02:53pm   From-EXTERNAL AFFAIRS         617-496-4511      T-046   P.12/12   F-387

Patient Name: Valerie Gillen                                                    Page 5

**Mood:**  Ms. Gillen earned a score of 20 on the Beck Depression Inventory-II, which falls in the moderate range of depression.  Items most strongly endorsed were those regarding loss of pleasure, concentration difficulties, fatigue, indecisiveness, and an increase in crying.  She earned a score of 23 on the Beck Anxiety Inventory, which is suggestive of a moderate level of anxiety.

**IMPRESSIONS AND RECOMMENDATIONS:** The current findings on neuropsychological testing reveal that Ms. Gillen is functioning in the superior range of intelligence which is consistent with her premorbid abilities and is not suggestive of a decline in functioning.  Performance on tests of attention and executive functioning were variable, as she performed well on several tasks in this area, but demonstrated relatively weaker performance on others.  Memory testing revealed mild impairments in acquisition and retrieval, but were normal with regard to retention.  Language testing was normal with regard to confrontation naming, repetition, comprehension, and prosody, but she demonstrated slight difficulty with verbal fluency to semantic category.  Performance on tasks of visuospatial functioning was normal. Responses on two self-report measures were suggestive of moderate levels of both anxiety and depression.

Unfortunately, the etiology of these difficulties remains unclear.  Her history is significant for numerous factors that have the ability to impair cognitive functioning, such as the meningioma, strokes, hysterectomy, sleep disturbance, and moderate levels of depression/anxiety and teasing apart the relative influence of each of these conditions is difficult.  Instead, as you suggested in your note, the etiology of her neuropsychological deficits is likely multifactorial.  However, it is noteworthy that there appears to be a slight lateralization of the findings, as she performed slightly better on tasks generally associated with right-hemisphere functioning.  For example, within tests of working memory, she performed better on Spatial Span than on Digit Span; within tests of abstract reasoning, she performed better on Matrix Reasoning than on Similarities; and within tests of memory, she performed better on nonverbal measures than verbal measures.  Without previous testing, it is difficult to conclude whether this discrepancy represents a premorbid condition or alternatively, whether some of this discrepancy (the verbal memory aspect, in particular) may be the result of the location of the meningioma.   Nonetheless, regardless of the "cause" of her neuropsychological deficits, if there is in fact a discrete origin, they are likely exacerbated by a combination of the above mentioned factors.

I shared these findings with Ms. Gillen after the completion of the testing and informed her that you would be discussing the results in greater detail during your next appointment with her.  As I shared with her during our meeting, these results will serve as an objective baseline against which to compare future performance.  This will be particularly useful should she have a surgical resection of the meningioma at some point in the future or if she notices a progression of deficits over time.  I would be happy to re-evaluate her in the future, if clinically indicated, and will leave this to your discretion.

Thank you for referring this interesting and pleasant woman for testing.  Please feel free to contact me at 781-551-0999 if I can be of any further assistance.

*Pamela Friedman*
Pamela Friedman, Psy.D.
Neuropsychologist, Child and Family Psychological Services

cc:    Dr. Frances Kronenberg
        Valerie Gillen

Lateralization of the finding

23

Exhibit E

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

VALERIE GILLEN )
      Plaintiff, )
)
v. )
                                        )     04-CV-12517-GAO
)
CNA GROUP LIFE ASSURANCE COMPANY )
      Defendant. )
)

## SUBPOENA TO PERMIT INSPECTION AND COPYING

To:    Pamela Friedman, Psy. D.
       C&F Psychological Services, Inc.
       89 Access Road, Suite 24
       Norwood, MA 02062

      YOU ARE HEREBY COMMANDED in the name of the United States in accordance with the provisions of Rule 45 of the Federal Rules of Civil Procedure to permit inspection and copying of the designated books, documents or tangible things identified in Exhibit A attached hereto, in your possession custody or control, at your office, C&F Psychological Services, Inc., 89 Access Road, Suite 24, Norwood, MA 02062, on July 15, 2005 at 3:30 P.M.

      Hereof fail not, as you will answer your default under the pains and penalties in the law in that behalf made and provided.

      Dated at Springfield the 17th day of June, 2005.


_Katherine R. Parsons_
David B. Crevier, BBO# 557242
Katherine R. Parsons, BBO# 657280
Attorneys for the Defendant
Crevier & Ryan, LLP
1500 Main Street, Suite 2020
Springfield, MA 01115-5727
Tel: (413) 787-2400
Fax: (413) 781-8235


cc:    Robert M. Elmer, Esq.
       Scott A. Bennett, Esq.

**\*No production at your office will be necessary if: 1) the documents enumerated in Exhibit A are produced and received by Defendant's Counsel at their office on or before July 12, 2005; and 2) the affidavit, attached hereto, is executed and produced with the requested documents. Please send all documents to Katherine R. Parsons, Crevier & Ryan, LLP, 1500 Main Street, Suite 2020, Springfield, MA 01115-5727, (413) 787-2400.**

<u>**Exhibit A**</u>

You are commanded to produce for inspection and copying at the time and place established

above, the following documents pertaining to the Plaintiff, Valerie Gillen, date of birth ▮▮▮▮▮

▮▮▮▮▮ Social Security No. ▮▮▮▮▮▮ ("Ms. Gillen"):

1) Any and all medical records and like documents, including but not limited to; all treatment notes, all documents memorializing diagnostic test performed on Ms. Gillen, including test results; any and all compilation of test data; any and all correspondence to or from other physicians or care providers;

2) Any and all documents authored by or received from Ms. Gillen;

3) Any and all documents memorializing medication prescribed to Ms. Gillen;

4) Any and all documents memorializing any opinion as to disability or incapacity;

5) All correspondence between you and the Defendant CNA Assurance Company, or any of its employees, agents, subsidiaries and affiliates and;

6) All correspondence between you and any other insurance company to whom Plaintiff has submitted a claim for disability benefits or Worker's Compensation Benefits.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

VALERIE GILLEN
       Plaintiff,           )

v.                      )     04-CV-12517-GAO

CNA GROUP LIFE ASSURANCE COMPANY   )
       Defendant.       )

## AFFIDAVIT AND CERTIFICATION OF THE RECCRDS FOR PAMELA FRIEDMAN, PSY. D.

     Now comes, _____(Keeper of the Records) and hereby states and deposes:

1.    Attached hereto are _____ pages of authentic and genuine exact copies of records made and kept in the regular course of business of Pamela Friedman, Psy. D., and pertaining to the care and treatment rendered by Valerie Gillen, Social Security No. 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.

2.    It is a regular practice of Pamela Friedman, Psy. D. to make and keep medical records, test results, correspondence and the like, such as those attached hereto.

3.    Such records are in the same conditions they were in when they were first made by Pamela Friedman, Psy. D.

4.    Such records were made at or shortly after the time of the event they record.

5.    Such records were either made by a person with knowledge of the underlying facts they record or from information transmitted by such a person to another.

Signed under the pains and penalties of perjury this ___ day of _____ 2005.

_____

Keeper of the Records for Pamela Friedman, Psy. D.



**Norfolk County Sheriff's Department**   P.O. Box 859215 Braintree, MA 02185-9215 / Tel. # (781) 326-1787
*Norfolk, ss.*

June 28, 2005

I hereby certify and return that on 6/24/2005 at 10:35AM I served a true and attested copy of the deposition subpoena with schedule A in this action in the following manner: To wit, by delivering in hand to Margrette Suplee, , person in charge at the time of service for Pamela  Friedman, Psy. D., at C & F Psychological Services, Inc.  89 Access Road,  Suite 24 Norwood, MA 02062.Witness Fee ($8.00), Basic Service Fee ($30.00), Copies-Attestation ($5.00), Conveyance ($4.50), Postage and Handling ($1.00), Travel ($3.20) Total Charges $51.70

_____
*Deputy Sheriff*

Deputy Sheriff James E. Riggs

Exhibit F

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| VALERIE GILLEN<br>　　　　Plaintiff, | )<br>)<br>)<br>) |
| v. | )<br>) |
| CNA GROUP LIFE ASSURANCE COMPANY<br>　　　　Defendant. | )<br>)<br>)<br>) |

04-CV-12517-GAO

## SUBPOENA TO PERMIT INSPECTION AND COPYING

To:　　Bernardino Vaccaro, M.D.
　　　　Brigham & Women's Hospital
　　　　75 Francis Street
　　　　Boston, MA 02115

　　　　YOU ARE HEREBY COMMANDED in the name of the United States in accordance with the provisions of Rule 45 of the Federal Rules of Civil Procedure to permit inspection and copying of the designated books, documents or tangible things identified in Exhibit A attached hereto, in your possession custody or control, at your office, Brigham & Women's Hospital, 75 Francis Street, Boston, MA 02115 on July 14, 2005 at 12:00 P.M.

　　　　Hereof fail not, as you will answer your default under the pains and penalties in the law in that behalf made and provided.

　　　　Dated at Springfield the 17ᵗʰ day of June, 2005.

David B. Crevier, BBO# 557242
Katherine R. Parsons, BBO# 657280
Attorneys for the Defendant
Crevier & Ryan, LLP
1500 Main Street, Suite 2020
Springfield, MA 01115-5727
Tel:  (413) 787-2400
Fax:  (413) 781-8235

cc:　　Robert M. Elmer, Esq.
　　　　Scott A. Bennett, Esq.

1

**\*No production at your office will be necessary if: 1) the documents enumerated in Exhibit A are produced and received by Defendant's Counsel at their office on or before July 12, 2005; and 2) the affidavit, attached hereto, is executed and produced with the requested documents.  Please send all documents to Katherine R. Parsons, Crevier & Ryan, LLP, 1500 Main Street, Suite 2020, Springfield, MA 01115-5727, (413) 787-2400.**

<u>Exhibit A</u>

You are commanded to produce for inspection and copying at the time and place established

above, the following documents pertaining to the Plaintiff, Valerie Gillen, date of birth ▇▇▇▇▇

▇▇▇▇▇▇▇ Social Security No.▇▇▇▇▇▇▇▇("Ms. Gillen"):

1)     Any and all medical records and like documents, including but not limited to; all treatment notes, all documents memorializing diagnostic test performed on Ms. Gillen, including test results; any and all compilation of test data; any and all correspondence to or from other physicians or care providers;

2)     Any and all documents authored by or received from Ms. Gillen;

3)     Any and all documents memorializing medication prescribed to Ms. Gillen;

4)     Any and all documents memorializing any opinion as to disability or incapacity;

5)     All correspondence between you and the Defendant CNA Assurance Company, or any of its employees, agents, subsidiaries and affiliates and;

6)     All correspondence between you and any other insurance company to whom Plaintiff has submitted a claim for disability benefits or Worker's Compensation Benefits.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| VALERIE GILLEN<br>          Plaintiff, | )<br>)<br>)<br>) |
| v. | )<br>)   04-CV-12517-GAO |
| CNA GROUP LIFE ASSURANCE COMPANY<br>          Defendant. | )<br>)<br>)<br>) |

## AFFIDAVIT AND CERTIFICATION OF THE RECORDS FOR BERNARDINO VACCARO, M.D.

Now comes, _____(Keeper of the Records) and hereby states and deposes:

1. Attached hereto are ____pages of authentic and genuine exact copies of records made and kept in the regular course of business of Bernardino Vaccaro, M.D. and pertaining to the care and treatment rendered by Valerie Gillen, Social Security No.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.

2. It is a regular practice of Bernardino Vaccaro, M.D. to make and keep medical records, test results, correspondence and the like, such as those attached hereto.

3. Such records are in the same conditions they were in when they were first made by Bernardino Vaccaro, M.D.

4. Such records were made at or shortly after the time of the event they record.

5. Such records were either made by a person with knowledge of the underlying facts they record or from information transmitted by such a person to another.

Signed under the pains and penalties of perjury this ___ day of _____2005.

_____

Keeper of the Records for Bernardino Vaccaro, M.D.

3

JUNE 28, 0

BY VIRTUE OF THIS FEDERAL SUBPOENA TO PERMIT INSPECTION & COPYING, I THIS DAY SERVED THE WITHIN NAMED DR. BERNANDINO VACCARO M.D. BY DELIVERING TO his SECRETARY, SUZANNE LACEY, IN hand, A TRUE & ATTESTED COPY. SAID SERVICE WAS MADE AT BRIGHAM & WOMEN'S HOSPITAL, 75 FRANCIS ST, BOSTON 02115 WITH EXHIBIT 'A'

Fred W. McDonald
CONSTABLE OF BOSTON

Exhibit G



**PSYCHOLOGICAL SERVICES, INC.**

Katherine Parsons, Esq.
Crevier & Ryan, LLP
1500 Main Street, Suite 2020
Springfield, MA  01115-5727

JUL  1 2005

June 28, 2005

Dear Ms. Parsons,

I received the subpoena you sent on 6/17/05 regarding the release of Ms. Valerie Gillen's records.  The material you requested is privileged information and I am unable to release the records until privilege is waived.

Sincerely,

*Pamela Friedman*

Pamela Friedman, Psy.D.


cc:    Robert Elmer, Esq.
       160 Federal Street, 5th Floor
       Boston, MA  02110

Exhibit H

**From:**     "Robert M. Elmer" <relmer@TDBGLLP.com>
**To:**         "Parsons" <KParsons@crevierandryan.com>
**Date:**      7/11/05 1:05PM
**Subject:**   Gillen v. CNA/The Hartford

Kate,

Val Gillen will not consent to the release of her records by her
psychiatrist, Dr. Vaccaro. Dr. Vaccaro does not have any information
regarding whether Ms. Gillen is disabled as a result of her cognitive
function. I have informed Dr. Vaccaro of Ms. Gillen's objection to the
production of her confidential psychiatric records.

Very truly yours,
Bob Elmer


------------------------------------
Robert M. Elmer
Taylor, Duane, Barton & Gilman LLP

160 Federal Street
Boston, MA  02110
(617) 654-8200
(617) 482-5350 (fax)

10 Dorrance Street
Providence, RI  02903
(401) 273-7171
(401) 273-2904 (fax)

Exhibit I

# CREVIER & RYAN, LLP

ATTORNEYS AT LAW

TOWER SQUARE
1500 MAIN STREET, SUITE 2020
SPRINGFIELD, MASSACHUSETTS 01115-5727

TELEPHONE (413) 787-2400

FAX (413) 781-8235

David B. Crevier *
Michael P. Ryan
Timothy J. Ryan
Katherine R. Parsons ♦◊

Timothy A. Reilly
Of Counsel
* Also admitted in NY
♦ Also admitted in RI
◊ Also admitted in CT

## VIA FACSIMILE ONLY

July 13, 2005

Robert M. Elmer, Esq.
Taylor, Duane, Barton & Gilman, LLP
160 Federal Street
Boston, MA 02110

Re:    Gillen vs. CNA Group Life Insurance Assurance Company ("CNA"),
       Civil Action No. 04-CV-12517-GAO

Dear Attorney Elmer:

As you know, inspections of the medical records of Dr. Bernardino Vacarro and Dr. Pamela Friedman are scheduled to occur on July 14, 2005 and July 15, 2005, respectively. Per your instruction, Dr. Vacarro has refused to provide us access to Ms. Gillen's medical records and Dr. Friedman has refused us access to Ms. Gillen's medical records on the basis of privilege.

Dr. Vacarro is a psychiatrist and Dr. Friedman is a psychologist and both treated or assessed Ms. Gillen with respect to her cognitive decline. In bringing this action, Ms. Gillen placed her mental status in issue. The records these doctors possess are directly relevant to Ms. Gillen's claim that she is unable to work due to cognitive decline. As such, we are entitled to the records from both Dr. Vacarro and Dr. Friedman.

Please contact these doctors and direct them to allow us access to Ms. Gillen's medical records on July 14 and 15. Thank you.

Very truly yours,

Katherine R. Parsons

cc:    Scott Bennett, Esq.

F:\Files\Hartford\Gillen\Elmer & Taylor Correspondence\elmer2 7.13.05.doc

CREVIER & RYAN, LLP
1500 Main Street, Suite 2020
Springfield, MA 01115-5727

## FACSIMILE TRANSMITTAL SHEET

| | |
|---|---|
| TO:<br>Robert Elmer, Esq. | FROM:<br>Katherine R Parsons, Esq. |
| COMPANY: | DATE:<br>JULY 13, 2005 |
| FAX NUMBER:<br>(617) 482-5350 | TOTAL NO. OF PAGES INCLUDING COVER:<br>2 |
| PHONE NUMBER: | SENDER'S TELEPHONE NUMBER:<br>413-787-2400 |
| RE:<br>Gillen | YOUR REFERENCE NUMBER: |

☐ URGENT    ☐ FOR REVIEW    ☐ PLEASE COMMENT    ☐ PLEASE REPLY    ☐ PLEASE RECYCLE

NOTES/COMMENTS:

See Attached.

Confidentiality Notice: The information contained in this fax constitutes a confidential and privileged attorney work product and is intended only for the personal and confidential use of the designated recipient named above. If the reader of this message is not the intended recipient or an agent for the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution or copying of this message is strictly prohibited. If received in error, please notify the sender at the above number and return the original to sender. Thank you.

IF YOU DO NOT RECEIVE ALL PAGES, PLEASE TELEPHONE US IMMEDIATELY AT (413) 781-8322.

TRANSMISSION VERIFICATION REPORT

```
                                    TIME : 07/13/2005 16:02
                                    NAME : CREVIER & RYAN, LLP
                                    FAX  : 4137818235
                                    TEL  : 4137872400
```

```
DATE,TIME              07/13  16:02
FAX NO./NAME           16174825350
DURATION               00:00:35
PAGE(S)                02
RESULT                 OK
MODE                   STANDARD
                       ECM
```

CREVIER & RYAN, LLP
1500 Main Street, Suite 2020
Springfield, MA 01115-5727

## FACSIMILE TRANSMITTAL SHEET

| TO: | FROM: |
|---|---|
| Robert Elmer, Esq. | Katherine R Parsons, Esq. |

| COMPANY: | DATE: |
|---|---|
| | JULY 13, 2005 |

| FAX NUMBER: | TOTAL NO. OF PAGES INCLUDING COVER: |
|---|---|
| (617) 482-5350 | 2 |

| PHONE NUMBER: | SENDER'S TELEPHONE NUMBER: |
|---|---|
| | 413-787-2400 |

| RE: | YOUR REFERENCE NUMBER: |
|---|---|
| Gillen | |

☐ URGENT    ☐ FOR REVIEW    ☐ PLEASE COMMENT    ☐ PLEASE REPLY    ☐ PLEASE RECYCLE

NOTES/COMMENTS:

See Attached.

Exhibit J

**From:**     "Robert M. Elmer" <relmer@TDBGLLP.com>
**To:**       "Parsons" <KParsons@crevierandryan.com>
**Date:**     7/22/05 5:43PM
**Subject:**  RE: Gillen v. CNA/The Hartford

I will let you know.

Have a good weekend.

-----Original Message-----
From: Parsons [mailto:KParsons@crevierandryan.com]
Sent: Friday, July 22, 2005 11:56 AM
To: Robert M. Elmer
Subject: Gillen v. CNA/The Hartford

Bob,

On July 14, you and I spoke about the Friedman and Vacarro medical
records -- you indicated that you were going to do some research and get
back to me regarding whether or not Ms. Gillen would waive her
privilege.  Please let me know if Ms. Gillen will allow us access to
those records.

Thanks,
Kate

Katherine R. Parsons, Esq.
Crevier & Ryan, LLP
1500 Main Street, Suite 2020
Springfield, MA 01115-5727
(413)787-2400
(413)781-8235 fax
kparsons@crevierandryan.com

Confidentiality Note:  This e-mail and any attachment to it, contains
privileged and confidential information intended only for the use of the
individual(s) or entity named on the email.  If the reader of this email
is not the intended recipient, or the employee or agent responsible for
delivering it to the intended recipient, you are hereby notified that
reading it is strictly prohibited.  If you have received this email in
error, please immediately return it to the sender and delete it from
your system.  Thank you.